## Richmond

## Donald W. Markham v. Lawrence A. Hall.

March 10, 1975.

Record No. 740385.

Present, All the Justices.

*Thomas V. Monahan (Hall, Monahan, Engle, Mahan & Mitchell,* on brief), for appellant.

*J. Frederick Larrick (Hugh D. McCormick; J. Adair Moore; Larrick & White,* on brief), for appellee.

Compton, J., delivered the opinion of the court.

We consider in this appeal whether the plaintiff's evidence was sufficient to establish a private right of way by prescription over the defendant's property. The two contiguous tracts involved in this dispute are primarily mountain land.

On August 21, 1973, the plaintiff, Lawrence A. Hall, filed his bill for injunction against the defendants, Donald W. Markham and Louise W. Markham.[1] Hall alleged that he was vested of an undivided fractional interest in a parcel of real estate in Warren County, Virginia, near Howellsville, containing approximately 299 acres, which adjoined a tract of land containing about 138

---

[1] Louise W. Markham died while this suit was pending.

acres owned by the Markhams. Hall asserted that a roadway leads from State Route 638 (Drummers Hill Road) into and through the Markham tract to the Hall property. Hall further alleged that the roadway had been used "constantly, continuously, adversely, hostily [sic], notoriously, exclusively and uninterruptedly" by him, his co-tenants and their predecessors in title for more than 50 years with the "full knowledge and acquiescence" of the Markhams and their predecessors in title.

Hall further alleged that the Markhams had closed, obstructed and restricted the roadway by, *inter alia,* posting "No Trespassing" signs and by constructing a pond and dam site over, on and across the original roadway. He further contended that his use of the roadway through the Markham tract, which lies north of the Hall real estate, was exclusive to Hall and his co-tenants and was not enjoyed in common with any other persons or parties. He, therefore, claimed an easement and right of way by prescription.

In the prayer of his bill, Hall requested: (1) a temporary and permanent injunction against the Markhams to prevent interference with his use of the roadway, (2) a determination whether or not he had acquired by prescription a right of way and easement to the continued and uninterrupted use and enjoyment of the roadway, (3) a determination and delineation of the exact location of the roadway, and (4) that the Markhams be ordered to remove any and all obstructions across the roadway.

In their answer, the Markhams denied that Hall was entitled to the relief prayed for and specifically denied that a roadway, as alleged by Hall, existed across their property. They affirmatively alleged "that at one time there was an unimproved path" from the Hall tract across the Markham property to State Route 638, but that such path was used only "permissibly." The Markhams further denied the plaintiff's allegation that the "path" had been in constant and uninterrupted use for more than 50 years, stating that it "has not been used [in the recent past] for a number of years."

The Chancellor denied the motion for a temporary injunction, after hearing evidence *ore tenus,* and appointed Richard U. Goode, Certified Land Surveyor, to make an examination of the parcels in question. The surveyor was ordered to file a report

stating whether or not the alleged right of way could be located and, if so, the "location, extent, width, condition and nature of such alleged right-of-way and easement . . . ."

The cause was heard on the merits, *ore tenus*, on November 16, 1973, and, on January 3, 1974, the final decree was entered. The Chancellor found that the predecessors in title of Hall, and his co-tenants, had acquired by prescription the right of way and easement across the Markham tract, as an appurtenance to the Hall tract, and, accordingly, permanently enjoined and restrained the Markhams from obstructing or interfering with the free and convenient use of the right of way by Hall, his co-tenants, and their successors in title. The final decree established a metes and bounds location and description of the easement in question. As established, the roadway bisected the Markham real estate. The width of the easement was 12 feet and its length was approximately 2,600 feet. We granted Markham an appeal from this final decree.

We reverse.

The significant facts relate to the origin, location and physical characteristics of the way; the relationship among these parties' predecessors in title; and, of course, the nature and extent of the use of the roadway.

The record does not reveal how or when Hall, 68 years of age at the time of the hearing, acquired his interest in the dominant tract. The earliest link in Hall's chain of title, shown by the evidence, was a September, 1842 deed from James McDonald (apparently not the James McDonald referred to *infra*) to John Churchill, Trustee. In October, 1843, Churchill, Trustee, conveyed the property to James R. Richards who, in November, 1843, conveyed it to John McDonald. Hall testified that he was the grand-nephew of John McDonald. The evidence shows that, in 1933 or 1934, a "kin to John McDonald," James McDonald, "redeemed" the tract from George Alexander who had purchased it during "The Depression" when it was "put up and sold for taxes." While the evidence does not trace the ownership of the Hall tract from 1843 to the present time, the parties seem to agree that for most of that period, the tract has been owned by descendents of John McDonald.

The Markhams acquired the servient tract in 1961. The most remote reference in Markham's chain of title, shown by the evidence, is a deed from John R. Marshall, and others, to Mary

McDonald dated in June, 1877. In February, 1901, Mary McDonald conveyed the property to Alice J. McDonald who conveyed it to J. E. Murdock by deed dated in June, 1945. Murdock conveyed the tract to Marvin Lee McDonald by deed dated in December, 1960, who conveyed it to Markham by deed dated December 18, 1961.

Hall, Goode, Gerald Jenkins, Loy Rosenberry, and Ruth Mitchell testified for the plaintiff. Markham and Marvin Lee McDonald testified for the defendants.

Ruth Mitchell was the sister of Marvin McDonald. Their father was James McDonald, an ancestor of Hall. James McDonald was the brother of Alice McDonald, a predecessor in title of Markham. Alice was a niece of John McDonald.

Rosenberry, 71 years of age, testified that he was born and raised in the Howellsville area and that he first went upon the Hall tract [2] in 1918. He hunted over both tracts with permission of the then owners from 1918 until "ten, or twelve years, I reckon, ago." He obtained permission to hunt over the servient tract from Alice McDonald and Marvin McDonald, both of whom he knew. He did not hunt on the servient tract when Murdock owned it. He testified that "quite a few times," he would also cross the Markham tract, using the way in question, to visit Simpson Son McDonald, who lived in the only house on the dominant tract. When asked by the trial judge, "What sort of a road was that in 1918?" Rosenberry answered, "Well, could get over it with a wagon, horses, walk it. Wasn't very few automobiles back in that time, you know."

At the time, the boundary line between the tracts in question was marked by a rail fence which no longer existed according to Rosenberry. A gate which existed on the boundary between the tracts was last seen by Rosenberry 25 to 30 years before the hearing.

Jenkins, 70 years of age, testified that during 1933 he lived for about eight months in the house on the dominant tract when Alexander owned it. When Jenkins moved into the house, he used Alexander's truck and "came over into this here at Charlie

---

[2] For clarity, the parcels in question will be hereinafter referred to as the Hall or dominant tract and the Markham or servient tract, even though the reference may relate to dates prior to the time Hall or Markham acquired an interest in the properties.

Reynolds." [3] From that point, he used a two-horse wagon to negotiate the way in question across the Markham tract to the house on the Hall tract. The only other persons who came to the house during that time were Jenkins' uncle and a hunting companion. The hunter gained access to the Hall tract by leaving his vehicle on property which adjoined the Markham tract on the north and by walking "up to" the Hall tract, whereas the uncle "brought his two-horse wagon up there to plow the garden." Jenkins and his family travelled in and out, using the way in question, on foot except when they used Reynolds' wagon. He did not recall any gate, only old posts, standing at the "entrance" of the Hall property.

Mrs. Mitchell, 58 years of age, testified that she was born two miles "below that property" and that she had lived in the neighborhood all of her life. She stated that John McDonald lived on the Hall tract until his death, which occurred when Mrs. Mitchell was "a small child." Her first recollection of the tracts in question, and the way, dated from 1924 when, at the age of eight or nine years, she rode a horse over both pieces of property. From 1924 to 1928, she used the road over the Markham tract to visit her uncle, Son McDonald, who then lived in the house on the Hall tract. Son attended church and received his mail in Howellsville, which was about three miles north of his house, using the way in question. He died in 1928.

Mrs. Mitchell stated that the only way to and from the Hall tract was the road in question over the Markham tract, which ended at the house on the Hall tract. She testified that she also used the road to visit "an old slave, a black lady that lived there with Uncle McDonald," and to visit the uncle's grave "in the orchard above the house." She further testified that the road was "the way the old people come out and came to Howellsville and the store and church. Rode buggies and horses." She stated that the way always had been the main road "in my father's time and way back in years of slave time." She described the road as follows: "The road follows a hollow, like. There was a bank and a creek along the side of it, but the road back in that

---

[3] The witness was apparently referring to one of several plats, introduced as exhibits in the suit, none of which shows the location of "Charlie Reynolds' " property. We observe here, as we did in *Stanley* v. *Mullins,* 187 Va. 193, 198, 45 S.E.2d 881, 884 (1948), that "[i]t is difficult to apply the evidence in this case to the subject of the controversy because the witnesses were allowed to identify points simply by local names, meaningless to those not privileged to have lived in the community."

time, people didn't have nothing to work a road with. They had to follow the easiest way out . . . That road was the closest way out."

Mrs. Mitchell was married in 1932 and "we moved to the top of [Blue Mountain]," which was about one mile south of the Hall tract, where she lived for one year in her father's house. She testified that Jenkins was the last person to live in the house on the Hall tract and that it was destroyed by fire between 1955 and 1959, leaving a chimney which still stands.

She stated that Alice McDonald, John McDonald and Son McDonald were good friends; that there were "[c]lose family ties with Alice McDonald and all of the McDonalds;" and that "the old McDonalds stuck well together."

Mrs. Mitchell recalled an "old rail fence" on the property line between the two tracts, and she remembered "two, old gateposts" and "an old gate" which had been there at one time but had "rotted and fell down . . . ." She recalled no other gate into the Hall tract.

Mrs. Mitchell testified that in the late 1950s she heard her brother, Marvin, tell their father, after Murdock "had got onto Marvin for cutting the road up [on the Markham tract]," that the road "is a right-of-way up in there and he [Murdock] . . . doesn't have no say so over that road . . . ." At the hearing, Marvin denied making the statement.

Hall testified that he went to the dominant tract in 1962 accompanied by Marvin McDonald because McDonald objected to Hall going across his land (the Markham tract), and because there was a dispute about the ownership of "the property." [4] Hall had posted a "bond" in order to view the property. They walked the road in question "straight up a hollow" to the site of the old house. He stated that the pond had not then been constructed on the Markham tract, but that it was subsequently built on a portion of the road he used in 1962 during his visit to his property. He further stated that within "the past year" a chain or cable was placed across the road at the northern boundary of the servient tract.

The surveyor's report, accompanied by a plat, was received in evidence. In the course of compiling his report, Goode made a

---

[4] Apparently, although it is not clear from the record, a suit was pending in 1962, but later dismissed, for partition of the dominant tract.

ground survey on November 6, 1973, used two aerial photographs taken by "the Government" in 1937, and used a 1944 edition of a United States Department of Interior Geological Survey, "Front Royal Quadrangle," which was based on surveys in 1927-28 and 1938-39. Goode had previously surveyed the servient tract on December 13, 1961, and the dominant tract on March 5, 1962.

On the plat Goode sketched: the way in question; the Markham property (which resembles a parallelogram); and the pond in question, located near the center of the parcel. The way follows a generally north-south course from near Drummers Hill Road on the north to Hall's tract on the south. Goode's evidence shows that for about three-fifths of the distance from north to south, a "new road had been built since Markham's purchase from Marvin McDonald. This new road is in good condition and suitable for driving an automobile over it." This "new road" runs along the west side of the pond, which measured about 300 feet, and terminates immediately south of the pond. For the balance of that north-south distance and into the Hall tract, he found "the old road" which he described as being "in good condition," stating that "it is possible to drive a 4 wheel drive along this section without putting the vehicle into 4 wheel drive, though most automobiles would not be high enough off the ground for clearance. Some sections of the old road have been worn down to a depth of about 3 feet below the original ground surface." Goode testified that this condition indicated to him that it was an old road which had been "travelled many years."

The northern portion of the "old road" for about 500 feet was visible to the surveyor and he reported that it was "possible" to drive over it in a four-wheel drive vehicle except at a point where there was a rotten wooden bridge. For this 500 feet, the "old" and "new" roads begin at the same point on the northern line of the Markham property. They separate and run south in a parallel manner less than 100 feet apart, and converge at the same point about 500 feet south of the point of beginning. He reported that it was "not possible" to locate a portion of the old road "because of construction of [the] pond." He also reported that the "old Government topographical maps" show the "old road before the Markham purchase."

Goode stated that he found two "No Trespass" signs on

Markham's property, near its southern boundary, and near the line of the roadway.

Markham testified that in 1961 when he agreed to buy the property, he walked over it to make his examination. He testified that the only "usable" road ran south from his northern line to about the center of the property and then ran southeast across a stream to the area of his cabin. He observed the "remnant" of an old road which, instead of running to the Hall tract, ran to property adjoining Markham on the east. Markham stated that he regularly visited his property from 1961 to 1973, using it for recreation, and that, during the period, he saw no evidence of use of the road in question. He placed a chain across the road after his cabin had been "broken into" on two occasions.

Because the northern portion of the road washed badly and because "it was so terribly wet down" there, Markham relocated that portion of the road so that he could maintain access to his cabin. The pond was installed in 1968 or 1969. He testified that the pond did not occupy any portion of the "old, or new road." He stated that no one asserted a right of way across his property until one year before the suit was filed and that he never heard "a suggestion" that there was, in fact, a right of way until April, 1973.

At the time of Markham's purchase, Marvin McDonald was given permission "to finish [his] timbering [on the property] on condition that he would keep the road in shape so" Markham could gain access to his cabin.

Marvin McDonald, 54 years of age, was born when his family lived "up on [Blue] [M]ountain." He testified that his recollection of the tracts in question dated from about 1929. After his father, James McDonald, "redeemed" the dominant tract in 1933 or 1934, a "timbering operation" was commenced by Marvin on that property in 1946. During the first "couple of years" of this "operation," he did not use the road in question. He stated that several other "wagon roads" went into the property from other directions. When he began timbering in "the lower land" in 1948, Murdock gave Marvin permission to open an old fence made of two rails and two strands of barbed wire which was between the two tracts in question. He further testified that when he first started to use the way in question in 1948, it was "just a path" which was not "discernible . . . down through the hollow" and not "passable unless you would have a horse and a

buggy . . . I mean, a wagon, a jeep, or a tractor." Marvin testified that he had examined the road in question within a week of the hearing and that portions of the present way "down through the hollow" were constructed by him in 1948 when he started using the right of way to haul timber and lumber by truck to Howellsville. He further testified that he installed a bridge across soft ground near the northern boundary of the servient tract because water ran in the road all during the year from "springs . . . out of that mountain."

Markham contends that the Chancellor erred in finding that an easement by prescription had been established. He argues that the evidence only establishes a long period, from 1918 to 1933, of permissive use among members of the same family and their friends; followed by a period of time, 1934 to 1948, of little or no use of any kind; followed by a period of use, 1948 to 1961, under express permission; and concluding with a period, 1961 to 1973, of little or no use. He asserts that the use during the last three periods subsequent to 1934 "has not been sufficient to be open and notorious. The use during the period prior to that date was permissive and accordingly not of a character to create an easement by prescription."

Hall contends that the trial court's finding was correct and was fully supported by the evidence. He argues that "long user raises the presumption of [a] grant," and contends that such presumption has not been rebutted. Accordingly, he argues, the findings of fact of the Chancellor carry the weight of a jury verdict, which should not be disturbed on appeal because they are not plainly wrong or without evidence to support them.

The main thrust of the oral argument before us by counsel for Hall was that the use of the way prior to 1901, when the tracts were presumably owned by strangers, must have been pursuant to a grant, and such use, pursuant to grant, continued after 1901. Hall argues that a grant should be presumed since Markham failed to establish the "origin of the way," and since Markham did not show a family relationship among the respective owners of the tracts in question from the "beginning of time" to 1901, when Alice McDonald purchased the Markham tract from Mary McDonald. We reject Hall's contentions.

The law in Virginia applicable to easements by prescription is well settled. "In order to establish a private right of way over the lands of another by prescription it must appear that the use of

the roadway by the claimant was adverse, under claim of right, exclusive, continuous, uninterrupted, and with knowledge and acquiescence of the owner of the land over which it passes, and that such use has continued for a period of at least twenty years." *Craig* v. *Kennedy*, 202 Va. 654, 657, 119 S.E.2d 320, 322-23 (1961). Where a way has been used exclusively, openly, without interruption, and continuously "for a period of more than twenty years, the origin of the way not being shown, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is." *Williams* v. *Green*, 111 Va. 205, 207, 68 S.E. 253, 254 (1910). This presumption of a grant or adverse right is merely *prima facie* and may be rebutted. *Id.;* 2 *Minor on Real Property* § 987 (2d ed. F. Ribble 1928). *Accord, Causey* v. *Lanigan*, 208 Va. 587, 590, 159 S.E.2d 655, 658 (1968); *Reid* v. *Garnett*, 101 Va. 47, 52, 43 S.E. 182, 184 (1903). "But this presumption of a grant after 20 years exclusive and adversary possession of the way . . . , *can only apply to cases in which possession can in no other way be accounted for,* than by a grant from the [owner of the servient tract] or those under whom he claims. Where that is not the case, the presumption must fail, . . ." *Nichols* v. *Aylor*, 34 Va. (7 Leigh) 546, 564 (1836) (emphasis supplied).

The use and possession of the way in question in this suit is clearly accounted for. The presumption of adverse use has been rebutted.

It is true, as Hall argues, that upon these facts, which show long use, the origin of the way not being revealed, the law presumes that such use has grown out of a grant by the owner of the servient tract, and that such continued use has been exercised under a title thus acquired. The burden of going forward with the evidence to rebut the presumption then shifts to Markham. But, contrary to Hall's argument, it is not true that the burden imposed upon Markham is to affirmatively show the "origin of the way" or to establish the relationship of the respective owners "from the beginning of time" to 1901, or even in the recent past prior to 1901. Markham's burden was to *account for the possession* during the prescriptive period claimed, and this burden has been carried as a matter of law.

The plaintiff's evidence has fixed the easement at the location found by the surveyor. Also, the testimony establishes the fact that it existed, in some form, as far back as "slave time." But the

positive and uncontradicted evidence is that its known use has always been permissive. The way has been used either with express permission or by near relatives who were on friendly terms, which, under these facts, does not demonstrate an adverse use. Marvin McDonald's opinion that a right of way existed, as related to his father in the late 1950s, is not sufficient to alter the foregoing conclusion.

The uncontroverted facts show that in 1901, when Alice McDonald acquired the Markham tract, her uncle, John McDonald, owned the Hall tract.[5] During the period from 1901 until Alice conveyed to Murdock in 1945, the use of the way in question resulted from the occupancy of the Hall tract by John and Son McDonald. James McDonald and his family used the road to travel from the top of Blue Mountain to Howellsville. It was used by Ruth McDonald Mitchell and her husband in 1932 to travel to and from Blue Mountain. Rosenberry used the road with permission when he hunted over both tracts. Jenkins used the road for only eight months in 1933 when Alexander owned the Hall tract. After 1945, the way was used with Murdock's express permission until 1960 when Marvin purchased the servient tract. Thereafter, little use of the road occurred until 1972 when the right of way was first asserted. Accordingly, the possession has been "accounted for otherwise than by grant." *Nichols* v. *Aylor, supra,* 34 Va. at 565. *See also Edmunds* v. *Pike,* 136 Va. 270, 118 S.E. 91 (1923).

For these reasons, the decree below will be reversed and a final decree will be here entered dismissing the plaintiff's bill of complaint.

*Reversed and final decree.*

---

[5] Indeed, when Mary McDonald acquired the Markham tract in 1877, John McDonald owned the Hall tract. Their relationship, if any, however, is not shown by the evidence.